IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

NORTHWEST ENVIRONMENTAL DEFENSE      )
CENTER, et al.,                       )
                                      )
                Plaintiffs,           )      Civil No. 04-1727-JE
                                      )
        v.                            )      OPINION AND ORDER[*]
                                      )
OWENS CORNING CORPORATION,            )
                                      )
                Defendant.            )
_____)

        Melissa Ann Powers
        Allison Michelle LaPlante
        Pacific Environmental Advocacy Center
        10015 S.W. Terwilliger Boulevard
        Portland, OR 97219

            Attorneys for Plaintiffs

        Lynne M. Paretchan
        Thomas E. Lindley
        Jeffrey C. Dobbins
        Perkins Coie, LLP
        1120 N.W. Couch Street, 10th Floor
        Portland, OR 97209

        Paul S. Lewandowski
        Owens Corning Corporation
        One Owens Corning Pkwy 3G
        Toledo, OH 43659

            Attorneys for Defendant

_____

        [*] All parties have now consented to have this matter heard
by a Magistrate Judge.  This Opinion and Order replaces the
Findings and Recommendation dated May 17, 2006.

**JELDERKS, Magistrate Judge:**

Plaintiffs Northwest Environmental Defense Center, Oregon Center for Environmental Health, and Sierra Club bring this action against defendant Owens Corning Corporation.

Plaintiffs contend that Owens Corning is constructing a polystyrene foam insulation manufacturing facility in Gresham, Oregon, with the potential to emit more than 250 tons per year of various harmful gases, without having obtained a required preconstruction permit, in violation of Section 165(a) of the Clean Air Act, 42 U.S.C. § 7475(a). Plaintiffs contend further that "this unpermitted construction has violated and is violating Part C of Title I of the Act, 42 U.S.C. §§ 7470-7479, and implementing regulations, 40 C.F.R. § 52.21 [and] § 51.166" and the Major New Source Review provisions of the Oregon State Implementation Plan, codified in the Oregon Administrative Code at OAR 340-224-0010 to 340-224-0100.

Plaintiffs also "allege that Owens Corning's unpermitted construction has violated and is violating provisions of the Oregon [State Implementation Plan] which require any facility that will emit more than 100 tons per year of a regulated air pollutant to obtain an Air Contaminant Discharge Permit . . . prior to construction[,] OAR 340-216-0020, along with "the written notice and approval provisions of the Oregon SIP, OAR 340-210-0215 and OAR 340-210-0240." First Amended Compl., ¶ 3.

Plaintiffs seek declaratory and injunctive relief, civil penalties, plus their costs and attorney fees.

Defendant moves to dismiss the entire complaint on the ground that Plaintiffs lack standing.  In the alternative, Defendant moves to strike those portions of each claim that seek more than one day's civil penalties.  Finally, Defendant moves to dismiss Plaintiffs' First Claim on the ground that Plaintiffs can state a claim, if any, only under state rather than federal law. Each of the foregoing motions is denied.

## Background

Gresham is a suburb of Portland, Oregon.  The principal gas at issue is 1-chloro-1, 1-difluoroethane, a hydrochlorofluorocarbon also known as HCFC-142b.  Plaintiffs contend HCFC-142b is "a potent greenhouse gas and ozone-depleting substance."  They fear emissions from Defendant's new facility in Gresham will heighten the risk that members of the Plaintiff organizations will contract certain diseases associated with elevated levels of ultraviolet radiation subsequent to ozone depletion, and that other diseases afflicting their members will be exacerbated, and that the environmental resources used and enjoyed by Plaintiffs will be harmed by ozone depletion.

Plaintiffs cite lupus as an example of a chronic condition that often results in heightened photosensitivity, and assert that "[a]t least one member of the Plaintiff organizations" presently has that condition.  Plaintiffs also allege that depletion of stratospheric ozone will result in greater amounts of radiation reaching the earth's surface in Oregon.  They represent that such increases in radiation have "been linked to a higher incidence of certain skin cancers, ailments such as lupus, cataracts, suppression of the human immune system, damage to

crops and aquatic organisms, and increased formation of ground-level ozone." First Amended Compl., ¶ 47.

Plaintiffs further allege that emissions from Defendant's Gresham facility will contribute to global warming, which in turn will harm environmental resources in Oregon used or enjoyed by members of the Plaintiff organizations.[1] Plaintiffs additionally allege that the facility under construction in Gresham will emit particulate matter, carbon monoxide, and volatile organic compounds that Plaintiffs fear will harm the health of their members and the local environment that they utilize.[2]

After this action was commenced, the parties entered into a stipulation. Plaintiffs agreed not to seek a preliminary injunction, and Defendant agreed to halt construction pending issuance of a state Air Contaminant Discharge Permit for the facility. The case is not moot, however. At a minimum, the parties still dispute whether construction was undertaken without one or more required permits, whether Defendant's facility is subject to those permit requirements, whether civil penalties

---

[1] Plaintiffs cite a report predicting that "global warming will have the following impacts in the Pacific Northwest: increased regional temperatures leading to an increased elevation in the upper tree line, prolonged allergy season, earlier breeding by plants and animals, and an increased fire season; rising sea levels, leading to increased erosion and a loss of land along the coastline; a decline in snowpack, which will lead to an increase in spring runoff, followed by decreased water levels in streams in the summer and fall; and a change in ocean circulation which will cause increased stress on estuarine species." First Amended Compl., ¶ 48.

[2] Plaintiffs cite asthma as an example, and assert that "[a]t least one member of the Plaintiff organizations" presently has that condition.

should be imposed, and, if so, the amount and disposition of
those penalties.

## Discussion

The Clean Air Act has been described as "without a doubt
the most complex environmental regulatory scheme," one "that is
bewildering at times to even the most experienced environmental
lawyers."  Susan Mandiberg & Susan Smith, CRIMES AGAINST THE
ENVIRONMENT § 4-2(a) (1997).  The present case focuses upon one
narrow corner of the Act, the preconstruction review process
mandated by Part C of Title I of the Clean Air Act.

Two general principles furnish the backdrop for the present
action.  First, Congress has enlisted the states as partners in
the national effort to curb air pollution.  Each state is
responsible for developing and periodically updating a State
Implementation Plan ("SIP"), which is subject to approval by the
federal Environmental Protection Agency.  The states play a major
role in enforcing SIPs.

Second, given the high cost of retrofitting existing
emissions sources with state-of-the-art control technologies,
Congress has focused its efforts upon curbing emissions from new
sources.  The latter have more flexibility as to location and
design of control equipment than do existing sources.
Consequently, construction of new sources of emissions usually
triggers application of more stringent levels of control under
the Act.  ENVIRONMENTAL LAW HANDBOOK, p. 243 (18th ed. 2005).

42 U.S.C. § 7475 mandates preconstruction review and
approval of major new stationary sources of air pollution, such

as factories.  A major stationary source is "any stationary facility or source of air pollutants which directly emits, or has the potential to emit, one hundred tons per year or more of any air pollutant . . . ."  42 U.S.C. § 7602(j).

The extent of the preconstruction review, and the substantive requirements that must be met, depend in part on the nature of the substance being emitted and whether the proposed new source is located in an "attainment area," *i.e.,* a region that is in compliance with certain air quality standards, or is situated in a "non-attainment area."

New stationary sources located in attainment areas are subject to the prevention of significant deterioration ("PSD") permit program if the source has the potential to emit at least 250 tons per year ("tpy") of a regulated pollutant, or at least 100 tpy of certain specified pollutants.  40 C.F.R. § 52.21(b)(1).

To receive a permit, the owner or operator of the proposed new source must show, *inter alia,* that the source (1) will comply with ambient air quality levels designed to prevent deterioration of air quality (the PSD increments), and (2) will employ best available control technology ("BACT") for each pollutant regulated under the Act that it will emit in significant amounts. 42 U.S.C. § 7475(a).

Plaintiffs allege that Defendant originally represented to the Oregon Department of Environmental Quality that the proposed Gresham facility had the potential to emit 283 tpy of HCFC-142b. Plaintiffs contend this quantity is sufficient to invoke the preconstruction review process, and that Defendant unlawfully

6 - OPINION AND ORDER

commenced construction without first obtaining the necessary permit.  After this action was filed, Defendant allegedly sought to retract its earlier statements, claiming the facility actually had the potential to emit less than 250 tpy of HCFC-142b. Plaintiffs dispute the accuracy of that lower figure.

## Discussion

### Defendant's Motion to Dismiss for Lack of Standing

Defendant contends this action must be dismissed because the Plaintiff organizations lack standing to prosecute the claims alleged in the Complaint.

An association has standing to bring suit on behalf of its members when the members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.  Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc., 528 U.S. 161, 181 (2000), citing Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343 (1977).

The interests asserted in this action are germane to the purposes of the Plaintiff organizations.  Neither the claims asserted nor the relief requested requires participation by the individual members of these organizations.  Accordingly, whether Plaintiffs have standing to prosecute the present action turns on whether the members of the Plaintiff organizations would have standing to sue in their own right.

The question of standing "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." Warth v. Seldin, 422 U.S. 490, 498 (1975).  The "constitutional limitations" are those that are necessary to satisfy Article III's requirement of a "case" or "controversy," without which this court lacks jurisdiction.  By contrast, "prudential limitations" are "judicially self-imposed limits on the exercise of federal jurisdiction," Allen v. Wright, 468 U.S. 737, 751 (1984), that are "founded in concern about the proper--and properly limited--role of the courts in a democratic society." Warth, 422 U.S. at 498.

**A.   Constitutional Limitations**

To satisfy the "case" or "controversy" requirement of Article III, a plaintiff must, generally speaking, demonstrate that:

(1) he or she has suffered (or is about to suffer) an "injury in fact":  an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical;

(2) there must be a causal connection between the injury and the conduct complained of; and

(3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).

Plaintiffs, as the party invoking federal jurisdiction, bear the burden of establishing standing.  Defenders of Wildlife, 504 U.S. at 561.  Because this is a motion to dismiss, the court must assume the truth of any well-pleaded facts alleged in the First

Amended Complaint.  Id.  At this stage, general factual
allegations of injury resulting from the defendant's conduct may
suffice, for on a motion to dismiss we "presum[e] that general
allegations embrace those specific facts that are necessary to
support the claim."  Id., quoting Lujan v. National Wildlife
Federation, 497 U.S. 871, 889 (1990).

> ### 1.  __Injury in Fact__

The phrase "injury in fact" notwithstanding, a plaintiff
need not wait until after he has been harmed before seeking
relief, particularly when the injuries are of a kind not readily
redressed by damages.  Instead, a plaintiff may petition the
court for injunctive relief to prevent the threatened harm.  A
"concrete risk of harm" to the plaintiff is sufficient to satisfy
the injury-in-fact requirement.  Covington v. Jefferson County,
358 F.3d 626, 638 (9th Cir. 2004) (risk of harm if landfill not
properly operated was sufficient to confer standing, and citing
additional authorities); Hall v. Norton, 266 F.3d 979, 976 (9th
Cir. 2001) ("evidence of a credible threat to the plaintiff's
physical well being from airborne pollutants" sufficient to
satisfy injury requirement).

The allegations that Plaintiffs "fear" or are "concerned"
they will be harmed if Defendant's facility discharges
pollutants--rather than affirmatively alleging that Plaintiffs
"will" sustain such harm (or are "informed and believe they
will")--do give some pause.  However, in environmental
litigation, such allegations can be enough to satisfy the injury-
in-fact requirement.  See Covington, 358 F.3d at 639 (sufficient
to allege that defendant's actions "caused 'reasonable concern'

of injury to" the plaintiff) and at 641 (evidence that plaintiffs observed leaks from landfill and "fear that this liquid will contaminate their property" was sufficient to show injury-in-fact).  See also Laidlaw, 528 U.S. at 182-84 (plaintiffs allegedly altered their behavior because they were "concerned" about harmful effects from Laidlaw's discharges); Central Delta Water Agency v. United States, 306 F.3d 938, 948 (9th Cir. 2002) ("'to require actual evidence of environmental harm, rather than an increased risk based on a violation of the statute, misunderstands the nature of environmental harm' . . . . a credible threat of harm is sufficient to constitute actual injury for standing purposes"); Natural Resources Defense Council v. Southwest Marine, Inc., 236 F.3d 985, 994 (9th Cir. 2000) (plaintiffs curtailed their use of bay due to concerns about discharges); Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc., 73 F.3d 546, 556 (5th Cir. 1996) (affiants' "concern" that discharges would impair water quality is sufficient; "[w]hether the affiants were 'concerned' or 'believed' or 'knew to a moral certainty' that produced water would adversely affect their activities on the bay is a semantic distinction that makes little difference in the standing analysis"); City of Davis v. Coleman, 521 F.2d 661, 670-71 (9th Cir. 1975) (plaintiff need not prove a specific adverse environmental impact, when the very purpose of bringing the action was to compel the defendant agency to investigate the environmental impacts of the project as required by statute).

Of course, the harm must be more than imaginary.  See Societe de Conditionnement en Aluminium v. Hunter Engineering

<u>Co., Inc.</u>, 655 F.2d 938, 944 (9th Cir. 1981) (a "real and
reasonable apprehension" is sufficient).  Defendant does not
suggest, however, that the harm described in the complaint is
entirely without any credible scientific basis nor--at this stage
of the proceedings--are Plaintiffs required to prove their
contentions.  The enactment by Congress of laws governing these
emissions, and the participation by the United States in related
international agreements, also weigh against any suggestion that
the threatened harm is entirely chimerical.[3]

Moreover, when a claim is premised upon procedural
irregularity--here, the failure to obtain a required permit and
allow the public to scrutinize and comment on the application--
"the redressability and imminence of injury requirements are
relaxed." <u>Covington</u>, 358 F.3d at 641.  "The person who has been
accorded a procedural right to protect his concrete interests can
assert that right without meeting all the normal standards for

_____

[3] I am aware of the decision from another circuit asserting
that the probability of a person being harmed by ozone depletion
is so remote that it cannot support standing.  <u>Natural Resources
Defense Council v. Environmental Protection Agency</u>, 440 F.3d 476
(D.C. Cir. 2006).  I am not persuaded by that decision (nor,
given the present procedural posture, could I even consider the
evidence that court found persuasive).  Moreover, since Congress
has determined that emissions into the atmosphere can pose a
threat to human health and warrant regulation, it does not seem
appropriate for the court to second guess that Congressional
determination under the cloak of a standing inquiry.  In
addition, it is likely that the evidence of harm to Oregon from
ozone depletion and global warming would at least be sufficient
to create a material factual dispute.  <u>Cf.</u> <u>Friends of the Earth,
Inc. v. Watson</u>, 2005 WL 2035596 at *3 (N.D. Calif. 2005).
Finally, in <u>NRDC v. EPA</u>, <i>supra</i>, the D.C. Circuit was confronting
a novel claim which the panel was uncertain it had authority to
decide.  By contrast, Congress has expressly authorized actions
such as this.

redressability and immediacy." <u>Defenders of Wildlife</u>, 504 U.S. at 573 n. 7.

"To satisfy the injury in fact requirement, a plaintiff asserting a procedural injury must show that the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." <u>Citizens for Better Forestry v. United States Dep't of Agriculture</u>, 341 F.3d 961, 969 (9th Cir. 2003); <u>Public Citizen v. Dep't of Transp.</u>, 316 F.3d 1002, 1015 (9th Cir. 2003), *reversed on other grounds*, 541 U.S. 752 (2004); <u>Cantrell v. City of Long Beach</u>, 241 F.3d 674, 679 (9th Cir. 2001). The plaintiff must also establish it is reasonably probable that the challenged action will threaten his concrete interests. <u>Citizens for Better Forestry</u>, 341 F.3d at 969-70.

Congress established the Clean Air Act preconstruction review and permit requirements to protect the very kinds of interests asserted here by Plaintiffs. The challenged action allegedly will threaten those interests, releasing a significant quantity of pollutants into the atmosphere in a densely populated metropolitan region where many members of the Plaintiff organizations live, work, commute, or recreate.

I conclude that Plaintiffs have satisfied this element of the standing inquiry. Cf. <u>Citizens for Better Forestry</u>, 341 F.3d at 970-71 (deprivation of opportunity to comment on decision whether to prepare an environmental impact statement was sufficient injury to confer standing); <u>Salmon River Concerned Citizens v. Robertson</u>, 32 F.3d 1346, 1355 (9th Cir. 1994) (injury to plaintiff results not from the agency's decision, but from the

agency's uninformed decisionmaking); Douglas Cty. v. Babbitt, 48 F.3d 1495, 1499-1501 (9th Cir. 1995). See also Federal Election Commission v. Akins, 524 U.S. 11, 21 (1998) (a plaintiff suffers an "injury in fact" when he fails to obtain information that must be publicly disclosed pursuant to a statute).

Defendant relies heavily on Defenders of Wildlife, but that case is easily distinguished on its facts. In Defenders of Wildlife, the plaintiffs sought a declaration that the Endangered Species Act requires federal agencies to consult with the U.S. Fish and Wildlife Service regarding any activities outside of the United States that those agencies fund or otherwise assist that may adversely impact endangered species. However, the plaintiffs were unable to establish that they personally had been (or were about to be) injured by the government's failure to conduct such consultations. The challenged projects were in Egypt and Sri Lanka. The affiants did not reside in those countries, nor have more than a vague intent to "some day" travel to those countries to interact with these species. Id. at 563-64. Thus, even if the injuries alleged in Defenders of Wildlife might otherwise suffice to establish standing, the affiants had made no showing of imminent injury to themselves as opposed to injury to the species.[4]

_____

    [4] A plurality of the Court also questioned whether a favorable ruling in that lawsuit would prevent or redress the alleged injury. The defendant in that action was the Secretary of Interior, who oversees the Fish and Wildlife Service, rather than the particular agency or foreign government actually funding or constructing the overseas projects. Those non-parties would not be bound by the court's decision. The foreign governments could also elect to continue the projects without American assistance. Id. at 568-71. Consequently, the plurality reasoned, any benefit to the plaintiffs was speculative at best.

Ultimately, in attempting to establish standing, the plaintiffs in Defenders of Wildlife could point to little more than a general concern about global environmental issues, and a belief that loss of any species, even on the other side of the world, diminishes the planet as a whole. Perhaps it is true that "[a]ny man's death diminishes me, because I am involved in Mankind,"[5] but something more is required to establish standing in a federal court.

The Complaint at issue here avoids those defects. The challenged emissions source is local, not halfway around the globe. Members of the Plaintiff organizations reside, work, and recreate near the partially-completed Gresham facility. Assuming the truth of the allegations in the Complaint, as I must on a motion to dismiss, those individuals would suffer some direct impact from emissions entering into the atmosphere from Defendant's facility, as would the local ecosystem with which these individuals constantly interact.

Other forecasted impacts from these emissions would operate less directly. For instance, ozone-depleting emissions from Defendant's facility must first ascend to the stratosphere before impacting persons on the ground in Oregon. Global warming likewise operates indirectly. Higher sea levels in Oregon will supposedly result from melting ice in the earth's polar regions. Changes in weather patterns, winds, ocean currents, and rainfall do not occur in isolation. Nevertheless, the adverse effects alleged in Plaintiffs' Complaint would be felt by them here in

---

[5] John Donne, *Meditation XVII: "No Man Is an Island"* (1623).

14 - OPINION AND ORDER

Oregon, and the source of Defendant's emissions would be in Oregon.

Adverse effects from the emissions will not necessarily be limited to Oregon, yet Plaintiffs' injuries are not diminished by the mere fact that other persons may also be injured by the Defendant's conduct. Standing has never required proof that the plaintiff is the <u>only</u> person injured by the defendant's conduct. A class action may be prosecuted on behalf of a class of millions of similarly situated persons, all claiming to have been injured by the same conduct. As Judge Gould's concurrence in <u>Covington</u> ably illustrates, the notion that "injury to all is injury to none" does not correctly reflect the current doctrine of standing. <u>Covington</u>, 358 F.3d at 651-55. If Defendant's theory of standing were correct, no person could have standing to maintain an action aimed at averting harm to the Grand Canyon or Yellowstone National Park, or threats to the giant sequoias and blue whales, as the loss of those treasures would be felt by everyone. For that matter, if the proposed action threatened the very survival of our species, no person would have standing to contest it. The greater the threatened harm, the less power the courts would have to intercede. That is an illogical proposition.

The cases cited by Defendant do not support the contention that a widely shared injury is not justiciable. Properly analyzed, the claims in such cases did not fail because too many persons were injured by the defendant's conduct, but rather because the plaintiffs in those cases failed to articulate a concrete injury that would be redressed by a favorable decision.

15 - OPINION AND ORDER

The injury-in-fact requirement helps assure that courts will not pass upon abstract intellectual problems, but will adjudicate concrete, living contests between adversaries. <u>Akins</u>, 524 U.S. at 20. Thus, a litigant must articulate how he has been or will be harmed by the defendant's conduct, and how he will benefit from a favorable decision.

For instance, in <u>Schlesinger v. Reservists Committee to Stop the War</u>, 418 U.S. 208 (1974), the Court dismissed, for want of standing, a claim that the Constitution prohibits members of Congress from simultaneously serving as members of the armed forces reserve. The plaintiffs failed to articulate how they personally were harmed by the alleged constitutional violation. The only interests articulated were abstract ones, and entirely hypothetical: a desire to have all laws enforced, or a general fear that members of Congress might be subject to "undue influence by the Executive Branch," or otherwise subjected to "possible inconsistent obligations which might cause them to violate their duty . . . ." <u>Id.</u> at 212. As the Court succinctly stated, "Abstract injury is not enough." <u>Id.</u> at 219, quoting <u>O'Shea v. Littleton</u>, 414 U.S. 488, 494 (1974). "Concrete injury, whether actual or threatened, is that indispensable element of a dispute which serves in part to cast it in a form traditionally capable of judicial resolution . . . . Moreover, when a court is asked to undertake constitutional adjudication, the most important and delicate of its responsibilities, the requirement of concrete injury further serves the function of insuring that such adjudication does not take place unnecessarily." <u>Reservists Committee</u>, 418 U.S. at 220-21.

16 - OPINION AND ORDER

Likewise, in <u>Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.</u>, 454 U.S. 464 (1982), the plaintiffs were upset that surplus government land had been given to a religious institution, yet failed to articulate any injury they sustained as a result, apart from their indignation at what they perceived to be an illegal act. The majority concluded that the plaintiffs lacked standing:

> The complaint in this case shares a common deficiency with those in <u>Schlesinger</u> and <u>Richardson</u>.  Although respondents claim that the Constitution has been violated, they claim nothing else.  They fail to identify any personal injury suffered by them *as a consequence* of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees.  That is not an injury sufficient to confer standing under Art. III, even though the disagreement is phrased in constitutional terms.  It is evident that respondents are firmly committed to the constitutional principle of separation of church and State, but standing is not measured by the intensity of the litigant's interest or the fervor of his advocacy.

<u>Valley Forge</u>, 454 U.S. at 485-86 (emphasis in original).

> Were the federal courts merely publicly funded forums for the ventilation of public grievances or the refinement of jurisprudential understanding, the concept of "standing" would be quite unnecessary.  But the "cases and controversies" language of Art. III forecloses the conversion of courts of the United States into judicial versions of college debating forums.

<u>Id.</u> at 473.

Most recently, in <u>DaimlerChrysler Corp. v. Cano</u>, ___ U.S. ___, 126 S. Ct. 1854 (2006), the Supreme Court held that several residents of Toledo, Ohio, lacked standing to challenge decisions

by the City and State to grant tax credits and tax exemptions to
an automobile company.  The plaintiffs failed to show how they
were injured by the challenged actions or would benefit from a
favorable court ruling.  At best, the plaintiffs could only hope
that rescission of the tax credits might someday result in more
taxes being collected, and perhaps result in an unspecified
reduction in the tax bills for all residents of the city or
state, though there was little assurance this would result.  Id.
at 1862-64.  The Court also was loathe to "interpose the federal
courts as 'virtually continuing monitors of the wisdom and
soundness' of state fiscal administration," second-guessing state
and local decisions regarding taxation and spending.  Id. at
1864.

The present case is easily distinguishable.  Plaintiffs have
identified concrete injuries flowing from the challenged conduct,
and explained how they would benefit from a favorable decision.[6]

### 2.  **Fairly Traceable**

The "fairly traceable" element of standing requires the
plaintiff to articulate a "causal connection between the injury
and the conduct complained of -- the injury has to be fairly
traceable to the challenged action of the defendant, and not the
result of the independent action of some third party not before
the court."  Defenders of Wildlife, 504 U.S. at 560-61 (internal
citations and quotations omitted).  Defendant is the entity that

---

[6] A further distinction is that in the "taxpayer standing"
cases, one branch of government was being asked to pass judgment
upon the actions of a coordinate branch.  Often, those cases
present difficult or novel questions of constitutional law.
Neither element is present here.

commenced construction of the Gresham facility and intends to operate it, and is also the entity answerable for any violations of the Clean Air Act arising from such activities.

While Defendant is not the sole entity allegedly discharging pollutants into the atmosphere that may adversely impact the Plaintiffs, the "fairly traceable" element does not require that a plaintiff show to a scientific certainty that the defendant's emissions, and only the defendant's emissions, are the source of the threatened harm.  See Sierra Club, Lone Star Chapter, 73 F.3d at 558; Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals Inc., 913 F.2d 64, 72 (3d Cir. 1990) (observing that the "fairly traceable" requirement "is not equivalent to a requirement of tort causation").  It is sufficient for Plaintiffs to assert that emissions from Defendant's facility will contribute to the pollution that threatens Plaintiffs' interests.  Id.[7]  See also Southwest Marine, 236 F.3d at 995 (requirement of traceability does not mean plaintiff must show to a scientific certainty that defendant's effluent caused the precise harm suffered by the plaintiff; rather, the plaintiff must show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific geographic area of concern).

I also reject Defendant's contention that Plaintiffs lack standing because the challenged conduct is the commencement of construction without the required permit, while the ultimate harm

---

[7]  Were the rule otherwise, a claim alleging harm to an endangered species could be defeated merely by pointing to other potential sources of harm to that species.

can result only from operation of the plant once construction is completed.  That argument improperly compartmentalizes the challenged conduct and the injury.

###    3.    **Redressability**

The redressability element is satisfied.  If Plaintiffs prevail in this action, Defendant's plant cannot open unless and until Defendant complies with all applicable legal requirements. Those requirements are intended to protect the public health and the public's right to participate in the review process. Plaintiffs are not obligated to also show that the permit request would be denied, or that the design of the plant or its emissions will be altered as a consequence of this litigation.  Cf. Akins, 524 U.S. at 25 (standing requirements satisfied even though the FEC might reach the same result once it reheard the matter and exercised its discretionary powers lawfully); Utah v. Babbitt, 137 F.3d 1193, 1216 n. 37 (10th Cir. 1998) (a plaintiff need not establish with certainty that adherence to the procedures would necessarily change the agency's ultimate decision); Parker v. Scrap Metal Processors, Inc., 386 F.3d 993, 1004 (11th Cir. 2004) ("A favorable decision on the merits would adequately redress Mrs. Parker's injury because such a decision would require the defendants to obtain and comply with the required permit").

Imposition of civil penalties also would redress, to an extent, the injury caused by Defendant's alleged failure to comply with the law, by deterring future violations.  See Friends of the Earth, 528 U.S. at 185-86; Covington, 358 F.3d at 641.

Plaintiffs need not show that the entire problem (for instance, global warming) will be cured if the Plaintiffs prevail

in this action, or that the challenged action is the exclusive source of that harm.  Particularly in environmental and land use cases, the challenged harm often results from the cumulative effects of many separate actions that, taken together, threaten the plaintiff's interests.  The relief sought in the Complaint need not promise to solve the entire problem, any more than a legislative body is forbidden to enact a law addressing a discrete part of a problem rather than the entire problem.  Cf. Railway Express Agency, Inc. v. New York, 336 U.S. 106, 110 (1949) ("It is no requirement of equal protection that all evils of the same genus be eradicated or none at all").

B.   **Prudential Limitations**

The "prudential limitations" upon standing include (1) a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interest of third parties," (2) the federal courts "refrain[] from adjudicating 'abstract questions of wide public significance' which amount to 'generalized grievances,' pervasively shared and most appropriately addressed in the representative branches," and (3) the complaint must "fall within 'the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'"  Valley Forge, 454 U.S. at 474-75 (citations omitted).

Two of the three prudential limitations are not seriously in dispute.  The interests represented by Plaintiffs are their own rights, notwithstanding that other similarly situated persons may benefit collaterally from the outcome.

Assuming the "zone of interest" requirement applies here, it is plainly satisfied.  The Clean Air Act was intended to protect the interests advanced by Plaintiffs here, and Congress expressly provided for citizen suits to enforce its provisions.

Defendant suggests that if Plaintiffs have standing to prosecute this action, then so would "a woman with lupus in Perth, Australia, and a man living in Ulan Bataar, Mongolia . . . ."  Reply at 9.  I express no opinion concerning the rights of such hypothetical litigants.  The actual Plaintiffs in this case have a strong geographical nexus to Defendant's Gresham facility.[8]

Congress recognized that federal authorities lack the resources to monitor emission sources throughout the nation, and that local citizens have a strong interest in the quality of the air they breathe and often are well-situated to observe potential threats to air quality.  Congress effectively deputized the public by expressly authorizing citizens to bring actions to enforce the Clean Air Act.  42 U.S.C. § 7406(a).  Far from being an aberrational claim, or an abuse of the statute, the claims and

---

[8]  Defendant also complains that Plaintiffs do not allege harm to just one particular location in Oregon.  Consequently, Defendant reasons, a person in Burns, Oregon, and one in Gresham, Oregon, would each be entitled to seek relief, though those cities are hundreds of miles apart.  Assuming, without deciding, that this is true, "alleging an injury-in-fact covering large areas within the state simply reflects the relatively broad nature of the potential harm."  Defenders of Wildlife v. United States Environmental Protection Agency, 420 F.3d 946, 957 (9th Cir. 2005).  Ashley Creek Phosphate Co. v. Norton, 420 F.3d 934 (9th Cir. 2005), is not to the contrary.  The plaintiff in Ashley Creek was situated 250 miles from the project location, and the only interest articulated was an economic interest in preventing mining by prospective competitors.

the claimants in this action are of a kind that Congress
contemplated when it enacted this legislation.

As for the remaining prudential limitation, issues such as
global warming and ozone depletion may be of "wide public
significance" but they are neither "abstract questions" nor mere
"generalized grievances."  An injury is not beyond the reach of
the courts simply because it is widespread.  As the Court
explained in Akins:

> Whether styled as a constitutional or prudential limit
> on standing, the Court has sometimes determined that
> where large numbers of Americans suffer alike, the
> political process, rather than the judicial process,
> may provide the more appropriate remedy for a widely
> shared grievance . . . .
>
> The kind of judicial language to which the FEC points,
> however, invariably appears in cases where the harm at
> issue is not only widely shared, but is also of an
> abstract and indefinite nature--for example, harm to
> the "common concern for obedience to law." * * * *  The
> abstract nature of the harm--for example, injury to the
> interest in seeing that the law is obeyed--deprives the
> case of the concrete specificity that characterized
> those controversies which were "the traditional concern
> of the courts at Westminster," and which today prevents
> a plaintiff from obtaining what would, in effect,
> amount to an advisory opinion.
>
> Often the fact that an interest is abstract and the
> fact that it is widely shared go hand in hand.  But
> their association is not invariable, and where a harm
> is concrete, though widely shared, the Court has found
> "injury in fact."  See Public Citizen, 491 U.S., at
> 449-450 ("The fact that other citizens or groups of
> citizens might make the same complaint after
> unsuccessfully demanding disclosure ... does not lessen
> [their] asserted injury").  Thus the fact that a
> political forum may be more readily available where an
> injury is widely shared (while counseling against, say,
> interpreting a statute as conferring standing) does
> not, by itself, automatically disqualify an interest
> for Article III purposes.  Such an interest, where
> sufficiently concrete, may count as an "injury in

fact."  This conclusion seems particularly obvious
where (to use a hypothetical example) large numbers of
individuals suffer the same common-law injury (say, a
widespread mass tort), or where large numbers of voters
suffer interference with voting rights conferred by
law.  We conclude that, similarly, the informational
injury at issue here, directly related to voting, the
most basic of political rights, is sufficiently
concrete and specific such that the fact that it is
widely shared does not deprive Congress of
constitutional power to authorize its vindication in
the federal courts.

Akins, 524 U.S. at 23-25 (internal citations and parentheticals
omitted).

In addition, Defendant's argument presumes that all persons

on the planet will suffer the identical injury from global

warming.  According to some theories, global warming may well

alter the lives of every person on the planet, but all will not

be affected in the same way.  Rising oceans may inundate coastal

communities, to the detriment of local residents and property

owners, yet the rising waters may benefit some formerly inland

property owners who discover they now own oceanfront property.

More frequent hurricanes may harm residents of Florida and the

Gulf Coast, yet increase business and profits for roofing

contractors.  Warm temperatures in Alaska may harm indigenous

subsistence hunters, yet benefit local air conditioning salesmen.

Some farmers will be hurt by warmer temperatures and changing

rainfall patterns, yet other farmers may benefit from longer

growing seasons or higher commodity prices.  Oregonians could be

deprived of their traditional summertime skiing on Mount Hood, an

injury distinct from the harms likely to be sustained by

residents of other states.  In short, it is unlikely that all

persons will be similarly impacted by global warming.  This conclusion further undermines Defendant's shared injury argument.

Lastly, Defendant ignores the final clause of this prudential limitation: that the grievance is one "most appropriately addressed in the representative branches." Congress has already considered the threat posed by emissions into the atmosphere, and enacted procedural and substantive requirements intended to address those ills.

At issue here is nothing more than whether the courts will enforce the Congressional mandate set forth in the Clean Air Act and its enabling regulations.  This court is not being asked to make a free-wheeling policy choice and decide whether global warming is, or is not, a serious threat or what measures should be taken to remedy that problem.  <u>Cf.</u> <u>Connecticut v. American Electric Power Co.</u>, 406 F. Supp. 2d 265 (S.D.N.Y. 2005) (declining to confront such issues on a "public nuisance" theory).

Enjoining violations of an Act of Congress, and imposing civil penalties on the wrongdoer at the behest of an injured plaintiff, lie not at the outer margin of the judicial authority but squarely within the judicial power to adjudicate cases and controversies.

Plaintiffs have standing to prosecute the claims set forth in the First Amendment Complaint.  Defendant's motion to dismiss for lack of standing is denied.

## **Defendant's Motion to Limit Civil Penalties to One Day**

Defendant next moves to strike Plaintiffs' demand for more than one day's civil penalties.  Defendant acknowledges that,

25 - OPINION AND ORDER

under the Clean Air Act, civil penalties ordinarily may be imposed for each day on which a violation occurs.  See, e.g., 42 U.S.C. § 7413(e)(2) ("A penalty may be assessed for each day of violation") and § 7413(b) (authorizing civil penalties on a per day basis).  However, Defendant argues, it can commence construction without a permit only once, hence it can be subject to only a single day's civil penalties for building the Gresham facility without a valid permit.  Plaintiff counters that each day that Defendant chose to continue building the facility without obtaining a permit, and dispatched a construction crew to the Gresham site, subjects Defendant to additional civil penalties.

Defendant points to no statute or regulation confining the offense to the isolated act of "commencing" construction without a permit.  On the contrary, 42 U.S.C. § 7475(a) provides that "[n]o major emitting facility on which construction is commenced after August 7, 1977, may be constructed in any area to which this part applies unless . . . a permit has been issued for such proposed facility in accordance with this part . . . ." (emphasis added).  The word "commenced" is used only to establish a safe harbor for facilities already under construction by the date specified in the law.

Commencing construction of a major new stationary emissions source without a valid preconstruction permit is a violation of the Clean Air Act, but so is continuing to construct such facility without a valid permit.  Each day that construction continues without a permit subjects the violator to additional penalties.

26 - OPINION AND ORDER

Were the rule otherwise, a court might have difficulty enjoining the completion of construction. Under Defendant's interpretation, the violation would have been complete when the first spade of earth was turned. Further construction activities would be beyond the reach of the law, hence there would be no legal basis for halting construction.

Under Defendant's interpretation of the law, a violator also would have little incentive to cease construction and obtain the necessary permit once the violation was discovered. From the violator's perspective, the damage would already be done. Even if the violator flaunted the law and completed construction, the maximum penalty to which it was subject would be a single day's civil penalties, *i.e.*, just $32,500 (or $27,500 for violations prior to March 15, 2004). Such a sum is dwarfed by the construction budget for major new stationary source facilities, which can cost millions or even hundreds of millions of dollars.

A single day's penalty also is dwarfed by the benefits that a company might hope to achieve by constructing a major stationary source without a pre-construction permit. Obtaining such a permit can be costly, both to navigate the sometimes treacherous waters of the permit process and to install pollution control equipment required to comply with the permit requirements. The permit application process also subjects the project to public scrutiny and comment. Finally, the permit process delays the start of construction and, by implication, the day the facility will become operational. Data must be gathered and submitted, and the application must be reviewed by the

agency.  There may be rounds of give-and-take before the permit conditions are finalized and the permit issued--or perhaps even denied.  A $32,500 civil penalty might seem a bargain, in comparison, if it meant avoiding the permit process.

To be sure, a permit would still be required to operate the facility.  In theory, that operating permit might be denied, or major alterations in the facility could be mandated.  As a practical matter, however, once the plant has been constructed, an agency might be hard-pressed to deny an operating permit or to require modifications that could readily have been accomplished before construction began but would be very costly afterwards. This reluctance could undermine a central purpose of the preconstruction review program.

In light of those considerations, I will not presume that Congress intended that $32,500 be the maximum penalty a court may impose on someone who illegally constructs a major new emission source without a valid preconstruction permit.  Defendant has identified no language in the statute supporting its position, let alone a clear statement evidencing that this was the intent of Congress.

Defendant does cite <u>New York v. Niagara Mohawk Power Corp.</u>, 263 F. Supp. 2d 650 (W.D.N.Y. 2003), which Defendant contends "is directly on point."  Defendant's Reply at 14.  It is not.  In <u>Niagara Mohawk</u>, the state brought an action alleging that a utility had undertaken various modifications, over the years, to a power plant without obtaining the required preconstruction permits.  Some of those modifications dated back to 1982, 20 years before the action was commenced.  The defendant moved to

dismiss certain claims, citing the five year statute of limitations.  The state argued that failure to obtain a pre-construction permit amounts to a "continuing violation" that persists so long as the plant is operating.  "Under the State's theory, every day that a facility operates without a preconstruction permit, the limitations period begins anew."  Id. at 661.  The court was concerned that "[t]he State's position, taken to its logical end, suggests a *de facto* elimination of any statute of limitation, for the limitation period would never begin to accrue as long as the facility remained in operation."  Id.  The court rejected that argument, concluding that for purposes of the statute of limitations, "violations of the preconstruction permitting requirements occur at the time of construction, not on a continuing basis."  Id.

Niagara Mohawk offers little support for Defendant's contention that it is subject to just a single day's civil penalties for constructing a new major stationary emission source without the required permit.  The court in Niagara Mohawk was concerned with when the statute of limitation begins to run, not what penalties may be imposed upon the violator.  Moreover, the decision contains language indicating that the violation does not end on the day that construction first commences, but continues to accrue until construction is complete.  See, e.g., id. at 661 ("violations of the preconstruction permitting requirements occur **at the time of construction**" . . . . **Once the construction or modification is complete**, the window in which to apply for and obtain a preconstruction permit is gone.") (Emphasis added).  See also United States v. Illinois Power Co., 245 F. Supp. 2d 951,

29 - OPINION AND ORDER

956 (S.D. Ill. 2003) ("preconstruction permit violations do not constitute violations that continue *past the completion of construction*") (emphasis added); United States v. Southern Indiana Gas and Electric Co., 2002 WL 1760752 at *5 (S.D. Ind. 2002) ("a violation of 42 U.S.C. § 7475 occurs when construction is commenced, but does not continue on past the date when construction is completed"); United States v. Westvaco Corp., 144 F. Supp.2d 439, 444 (D. Md. 2001) ("the statute of limitations bars the Government from bringing claims based on preconstruction permit violations where the construction was completed more than five years prior [to] the commencement of the lawsuit"); United States v. Brotech Corp., 2000 WL 1368023 at *3 (E.D. Pa. 2000) (statute of limitations barred claims for equipment installation completed more than five years prior to commencement of the action).[9]

At oral argument, Owens Corning also argued that a rule subjecting it to penalties for each day of unlawful construction might encourage an environmental plaintiff to lie in the weeds and wait until the project is complete before commencing litigation.  That is an improbable scenario, for several reasons. First, an environmental group that followed such a strategy might seriously jeopardize any chance it had of halting or

---

[9]  Some courts have accepted the continuing violation theory and held that claims for failure to obtain a preconstruction permit remain viable for as long as the facility remains in operation, and are not barred by the statute of limitations. See Niagara Mohawk, 263 F. Supp. 2d at 662, n. 20 (collecting citations); United States v. Duke Energy Corp., 278 F. Supp. 2d 619, 649-53 (M.D.N.C. 2003), *affirmed on other grounds*, 411 F.3d 539 (4th Cir. 2005), *cert. granted*, ___ U.S. ___, 2006 WL 1310699 (May 15, 2006).  I express no position as to which line of cases is correct, as that issue is not before me.

significantly influencing the project.  The best opportunity to influence the final design is before construction commences, not after it is completed.  A private plaintiff would also have little incentive to pursue such a strategy, as such plaintiff does not receive the civil penalties imposed on a violator.  In any event, the court already has ample power to address such concerns.  Cf. Grand Canyon Trust v. Tucson Electric Power Co., 391 F.3d 979, 987-89 (9th Cir. 2004) (discussing statute of limitations, laches, and court's equitable powers to determine amount of any civil penalty, in response to assertion that private citizen deliberately delayed bringing an action to enforce Clean Air Act).

In summary, if Defendant unlawfully constructed the Gresham facility without first obtaining a required preconstruction permit, then Defendant's liability for civil penalties is not capped at "one day."  Consequently, Defendant's motion to strike Plaintiffs' demand for more than that amount is denied.[10]

/ / / /

---

[10]  Plaintiffs also argue that Defendant is liable for civil penalties not only for each day on which Defendant actively continued construction of the Gresham facility, but also for each day that the un-permitted facility remains in place until the defect is cured, or the partially-completed facility is removed, or the project formally abandoned.  Plaintiffs' argument is somewhat weaker now that Defendant has halted construction pending resolution of the dispute.  With some environmental laws, the mere presence of a construction site may cause further injury; scenic views may be impaired or silt laden runoff may impair water quality.  That does not seem to be the case with the particular permit requirements at issue here.  For purposes of the present motion, however, it is not necessary to predict any civil penalty that might be assessed against Defendant if Plaintiffs prevail.  It is sufficient to state that it is not limited to the one day's penalty asserted in Defendant's motion, but could be significantly less than the sum that Plaintiffs are seeking.

**Defendant's Motion to Strike First Claim**

Defendant moves to dismiss the First Claim, on the ground that state substantive law, rather than federal, is controlling once a State Implementation Plan has been enacted.  It is unclear why Defendant is asserting this motion.  Federal law sets a floor, *i.e.,* the minimum requirements that must be met.  A State may voluntarily impose substantive requirements that are more restrictive than what federal law would require, but not less restrictive.  F. Grad, 1 TREATISE ON ENVIRONMENTAL LAW at 2-112.31 (1999).  Consequently, it is difficult to see how Defendant will derive any benefit from insisting that the court apply State standards which, by definition, must be at least as restrictive as the federal standards.  Plaintiffs already have a parallel claim invoking the state standards.

In its reply brief, and again at oral argument, Defendant hinted that although the State and federal laws contain similar language, the State has interpreted certain words in a manner more favorable to Defendant than the federal government's interpretation.  I question how that can be possible when federal law establishes the minimum requirements that must be met.

My initial impression is that Plaintiff may sue to enforce either the state or federal standards.  See Ashoff v. City of Ukiah, 130 F.3d 409, 411-13 (9th Cir. 1997); Covington, 358 F.3d at 641-42; Weiler v. Chatham Forest Products, Inc., 392 F.3d 532, 536-39 (2d Cir. 2004); Parker, 386 F.3d at 1005-08.  However, I decline to decide this question in a vacuum, with no facts or context, and no reason to believe that the determination will materially affect the rights of the parties.  Accordingly, this

motion is denied for now, with leave to revisit the issue if events warrant.

## **Conclusion**

Defendant's Motion to Dismiss (# 30) is denied in its entirety.

DATED this 8th day of June, 2006.


/s/  John Jelderks
John Jelderks
U.S. Magistrate Judge